**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DENISE GUERRERO,**

                                        **Plaintiff,**

       **vs.**                                  **1:24-cv-01344**
                                                     **(MAD/DJS)**

**ALBANY MED HEALTH SYSTEM,**

                                        **Defendant.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

**DENISE GUERRERO**
6406 State Route 66
East Nassau, New York 12062
Plaintiff _pro se_

**BOND, SCHOENECK & KING, PLLC**       **ROBERT F. MANFREDO, ESQ.**
22 Corporate Woods Blvd., Suite 501      **NATALIE C. VOGEL, ESQ.**
Albany, New York 12211
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

      Plaintiff commenced this action on November 5, 2024, after receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") on August 29, 2024. _See_ Dkt. Nos. 1, 1-2. She alleges employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and the New York Human Rights Law ("HRL"). _See_ Dkt. No. 1. She also alleges intentional infliction of emotional distress ("IIED") under New York law. _See id._ Plaintiff, who is proceeding _pro se_, filed an amended complaint on February 10, 2025, to invoke the relation back doctrine with

respect to her IIED claim. Dkt. Nos. 16, 19. With the Court's permission, Plaintiff filed a second amended complaint on February 25, 2025. Dkt. No. 25. In response, on March 11, 2025, Defendant filed a motion to dismiss the second amended complaint. Dkt. Nos. 26, 26-1. Plaintiff then requested leave to file a third amended complaint to remedy defects with her IIED claim, which the Court denied. *See* Dkt. Nos. 29, 30. Instead, the Court instructed Plaintiff to file a response to Defendant's motion to dismiss, and that the response should include "any facts she believes are relevant to the timeliness of [her] IIED claim." Dkt. No. 30. Plaintiff filed a memorandum in opposition to the motion to dismiss on March 31, 2025. Dkt. No. 32. Defendant filed a reply on April 7, 2025, Dkt. No. 33, and Plaintiff filed a sur-reply on April 14, 2025, Dkt. No. 35.

Currently before the Court is Defendant's motion to dismiss the second amended complaint under Federal Rule of Civil Procedure 12. Dkt. No. 26-1. Defendant asserts that Plaintiff failed to sufficiently allege claims of disability discrimination, failure to accommodate a disability, race discrimination, retaliation, hostile work environment, and IIED. *See id.* Additionally, Defendant alleges that Plaintiff's IIED claim is time-barred. *See id.*

## II. BACKGROUND

At the time of the alleged discrimination, Plaintiff was employed by Defendant as an administrative support associate ("ASA"). Dkt. No. 25 at 3. In January of 2023, Defendant transferred Plaintiff from Valatie Medical Arts in Valatie, New York to Columbia Memorial Health in Hudson, New York. *Id.* at 6. During an introductory meeting at her new work location, Plaintiff told her supervisor that she has a traumatic brain injury. *Id.* According to Plaintiff, her brain injury has negatively affected her vision, motor function, memory, and cognitive abilities. *Id.* at 4, 7. She also suffers from post-traumatic stress disorder, anxiety, claustrophobia, and

2

lockjaw.  *Id.* at 4.  Plaintiff attests that stress exacerbates her symptoms associated with these

conditions.  *Id.*

On January 31, 2023, Plaintiff alleges that she was the only ASA "on the back end of the

clinic" at Columbia Memorial.  *Id.* at 7.  Two other ASAs worked at the "front end."  *Id.*  Plaintiff

identifies herself as Filipina and the other two ASAs as Caucasian.  *Id.* at 4, 7.  That morning, she

had an altercation with her supervisor, Margaret Warner.  *Id.* at 7-8.  Plaintiff alleges that when

she asked Warner to help "room" patients for one of the physicians (who "has the same coloring"

as Plaintiff), Warner "yelled [at Plaintiff] with hatred" and insisted the physician could "room her

own patients."  *Id.*  According to Plaintiff, Warner roomed several patients for a white male

physician.  *Id.* at 8.

That same day,[1] Plaintiff alleges that Warner "lunged" at her, "hover[ed] over" Plaintiff

while she was seated at her desk, threw a piece of paper in Plaintiff's face, and yelled in Plaintiff's

face.  *Id.*  According to Plaintiff, Warner was angry with her for printing documents to a

physician's printer and "impl[ied] . . . she was stupid."  *Id.*  Plaintiff further alleges that later the

same afternoon, Warner "harassed, intimidated[,] and discriminated" against her by "using

[Plaintiff's] last name in a degrading tone of voice."  *Id.*  Plaintiff says she told Warner that she

has a "big presence" and that her behavior was "aggressive and rude," which at least one other

individual witnessed.  *Id.*  The following day, Warner published a Facebook post that seemingly

referred to the incident with Plaintiff.  *Id.* at 9; Dkt. No. 25-1 at 38.  The post received several

comments in response, including one that read, "Get it girl.  Put em [sic] straight . . . ."  Dkt. No.

---

[1] In her second amended complaint, Plaintiff alleges that the altercation with Warner occurred on
January 31, 2024.  Dkt. No. 25 at 8.  However, investigative notes referenced in the second
amended complaint as Exhibit F show that the altercation took place on January 31, 2023.  Dkt.
No. 25-1 at 36.

25 at 9; Dkt. No. 25-1 at 39.  Plaintiff alleges that she felt "threatened, bullied[,] and subjected to discrimination and harassment based on her race and disability."  Dkt. No. 25 at 9.

On February 2, 2023, Warner issued Plaintiff a written warning for "unprofessional, disrespectful," and disruptive behavior.  Dkt. No. 25-1 at 41.  Specifically, Warner stated that Plaintiff had improperly printed documents to a physician's printer for the fourth time in two days, and when asked to make sure she did not print to the physician's printer, Plaintiff "yell[ed] across the office . . . after being asked to lower her voice."  *Id.*  Plaintiff contends that a technical issue caused her to print to the wrong printer and that she did not yell.  *Id.* at 42.  She characterizes the written warning as harassment.  *See* Dkt. No. 25 at 9.  On February 3, 2023,[2] Plaintiff filed a complaint with the human resources department.  *See id.* at 10; Dkt. No. 25-1 at 46-47.

Plaintiff also alleges that in February 2023,[3] Defendant treated her differently from at least two white ASAs by denying her access to voicemail.  *See* Dkt. No. 25 at 9.  She contends that she handled twice the workload of the other ASAs and could never leave her workstation because she had no voicemail box.  *See id.*  The other ASAs, according to Plaintiff, had voicemail boxes and could leave their desks.  *Id.*  However, in an email from Warner that is referenced in the second amended complaint as Exhibit I, Warner mentions that numerous patients complained about unreturned phone calls before Plaintiff's voicemail access was revoked.  Dkt. No. 25-1 at 44.

---

[2] In her second amended complaint, Plaintiff alleges that she filed the human resources complaint on February 3, 2024.  Dkt. No. 25 at 10.  However, the human resources complaint was incorporated by reference into the pleading as Exhibit J and is dated February 3, 2023.  Dkt. No. 25-1 at 46.

[3] In her second amended complaint, Plaintiff alleges that the denial of voicemail access occurred in February 2024.  Dkt. No. 25 at 9.  However, an email from Warner dated February 3, 2023, referenced in the second amended complaint as Exhibit I, suggests Plaintiff's voicemail access was removed in February 2023.  Dkt. No. 25-1 at 44.

On March 20, 2023, Plaintiff requested a disability accommodation. Dkt. No. 25 at 10. Because of her diagnosed traumatic brain injury, post-traumatic stress disorder, and the associated symptoms, Plaintiff wanted permission to work remotely. *See id.*; Dkt. No. 25-1 at 49-53. In her accommodation request form, Plaintiff claimed that telework would reduce her stress and anxiety from working in a disruptive and hostile environment. *See* Dkt. No. 25-1 at 49-53. Plaintiff alleges that Defendant refused to engage in any interactive process regarding the requested accommodation. Dkt. No. 25 at 11.

On March 21, 2023,[4] Plaintiff alleges that two people from human resources "ambushed" her, including "a large intimidating male." *Id.* The human resources employees purportedly told Plaintiff that she could be terminated for misconduct because she clocked in while visiting human resources and attending an in-house medical appointment. *See id.* Plaintiff insists that two white employees conspired to fabricate the misconduct allegation, and that other employees have been allowed to attend human resources and medical appointments while on the clock. *See id.* at 11-12. She also contends that while numerous white employees were interviewed in connection with the misconduct accusation, she was not. *Id.* at 11.

Within one week, Plaintiff was terminated. *Id.* at 12. According to Defendant, the termination was for "[d]isruptive behavior and misappropriation of time." Dkt. No. 25-1 at 55. Plaintiff characterizes Defendant's conduct as intentional infliction of emotional distress, partly because the termination process was "prolong[ed]" through the weekend. Dkt. No. 25 at 12-13. She also asserts that Defendant's provided reasons for the termination are pretextual. *Id.* at 12.

---

[4] In her second amended complaint, Plaintiff asserts that this interaction occurred on March 21, 2024. Dkt. No. 25 at 11. However, she later states that she was terminated over the phone on March 24, 2023. *Id.* at 12. Documents from Defendant's human resources department, which are incorporated by reference into the second amended complaint, indicate that Plaintiff's final day of service was March 27, 2023. Dkt. No. 25-1 at 55, 57.

## III. DISCUSSION

### A.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, courts may still consider documents attached to the pleading as an exhibit or incorporated by reference into the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)). A court may also consider documents that are "integral" to the pleading, even if they are not physically attached or incorporated by reference. *See id.* (quoting *Chambers*, 282 F.3d at 152-53). In ruling on a motion to dismiss, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation

omitted).  A complaint that "pleads facts that are 'merely consistent with' a defendant's liability"
generally does not meet the pleading standard.  *See id.* (quoting *Twombly*, 550 U.S. at 557).

However, complaints by *pro se* parties continue to be accorded more deference than those
filed by attorneys.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  As such, *Twombly* and *Iqbal*
notwithstanding, this Court must continue to "construe [a *pro se* complaint] broadly, and interpret
[it] to raise the strongest arguments that [it] suggests."  *Weixel v. Bd. of Educ.*, 287 F.3d 138, 146
(2d Cir. 2002).

## B.    IIED

In its motion to dismiss, Defendant asserts that Plaintiff's IIED claim is barred by the
statute of limitations.  Dkt. No. 26-1 at 24.  Under New York law, the statute of limitations on an
IIED claim is one year.  *E.g.*, *Arnold v. Town of Camillus*, 662 F. Supp. 3d 245, 269 (N.D.N.Y.
2023); *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001) (citing
N.Y. C.P.L.R. § 215(3)).  In other words, for an IIED claim to be timely, a plaintiff generally
must sue within one year of the challenged conduct.  *See Hammond v. New York*, No. 1:24-CV-
0201, 2025 WL 1369275, *5 (N.D.N.Y. May 12, 2025).  Exceptions may exist where the statute
of limitations is tolled, *see id.*, or the relation back doctrine applies, *see* Fed. R. Civ. P. 15(c).

### 1.    Relation Back

The relation back doctrine allows a new claim added by amendment to benefit from the
timeliness of the original pleading, even if the new claim would otherwise be time-barred.  *See*
Fed. R. Civ. P. 15(c).  An amendment to a complaint may relate back to the date of the original
complaint when it "asserts a claim or defense that arose out of the conduct, transaction, or
occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P.

7

15(c)(1)(B).  Alternatively, relation back is allowed where the law providing the statute of limitations permits it.  Fed. R. Civ. P. 15(c)(1)(A).

Here, Plaintiff alleges that Defendant subjected her to IIED while she was an employee, particularly during the termination process.  *See* Dkt. No. 25.  She was terminated in March 2023, Dkt. No. 25-1 at 55, 57, and brought this action in November 2024, Dkt. No. 1, more than a year and a half later.  Also, as Defendant notes in its motion to dismiss, Plaintiff first asserted her IIED claim in the original complaint.  *See* Dkt. No. 26-1 at 25; Dkt. No. 1 at 2.  Thus, the IIED claim is not newly asserted in the amended complaint, so relation back is not available on that ground.  Furthermore, New York's Civil Practice Law and Rules ("CPLR"), which provide the one-year statute of limitations, contain a rule allowing relation back to the date of the original complaint, but not earlier.  *See* N.Y. C.P.L.R. § 203(f) ("A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed . . . .").  Accordingly, even if relation back were proper here, Plaintiff's IIED claim would still be untimely without a significant toll on the statute of limitations.

### 2.  *Tolling the Statute of Limitations*

With respect to tolling the statute of limitations and potentially extending Plaintiff's time to sue on that basis, this Court has recognized that "[t]he filing of an EEOC charge does not toll the applicable statute of limitations for state law . . . claims that arise out of the same events as [an] underlying Title VII claim."  *Blackburn v. Eli Lilly & Co.*, No. 99-CV-0722, 1999 WL 1125048, *5 (N.D.N.Y. Dec. 1, 1999).  Thus, because Plaintiff's IIED claim arises from the same series of events underlying her other claims, her wait for the EEOC's letter does not justify extension of her time to sue.

In some situations, New York law recognizes disability as a ground to toll a statute of limitations. *See* N.Y. C.P.L.R. § 208 (providing "disability because of . . . insanity" as a ground for tolling a limitations period). The New York Court of Appeals has narrowly interpreted the CPLR's "insanity" tolling provision and stated that it extends only to "those individuals who are unable to protect their legal rights because of an all-over inability to function in society." *McCarthy v. Volkswagen of Am., Inc.*, 55 N.Y.2d 543, 548 (1982) (holding that the statute of limitations could not be tolled in a personal injury action, despite the plaintiff's diagnosed "post traumatic neurosis" after a serious car accident, because the plaintiff showed an ability to comprehend his legal rights). Accordingly, although Plaintiff has alleged that she suffers from multiple disabilities that profoundly affect her quality of life, she has not alleged insanity within the meaning of the law. Despite her diagnosed conditions and their associated symptoms, she pursued this action *pro se*. Also, at no point did Plaintiff allege an inability to manage her affairs or understand her legal rights as a result of her diagnosed disabilities, nor did she allege that such a condition delayed her filing of this action. Thus, the statute of limitations on Plaintiff's IIED claim was not tolled, and the claim is dismissed as untimely.[5]

## C.    Disability Discrimination

---

[5] The Court acknowledges that instead of allowing Plaintiff to amend her complaint again, it invited Plaintiff to elaborate on the timeliness of her IIED claim via a response to the motion to dismiss. *See* Dkt. No. 30. In her response, Plaintiff correctly asserts that this Court may exercise supplemental jurisdiction over the IIED claim pursuant to 28 U.S.C. § 1367. *See* Dkt. No. 32 at 23. However, the existence of jurisdiction is distinct from the presence of a statute of limitations, which dictates how much time a plaintiff has to sue on a cause of action in a court with jurisdiction. Plaintiff invokes 28 U.S.C. § 1367(d), which "stop[s] the clock" on a state law claim *while it is pending in federal court. See* Dkt. No. 32 at 24; *Artis v. Dist. of Columbia*, 583 U.S. 71, 74-75 (2018). If the federal court declines supplemental jurisdiction and dismisses the state law claim, the § 1367(d) toll may allow the plaintiff to refile the claim in state court. *See Artis*, 583 U.S. at 74. The toll does *not* extend a plaintiff's time to file her claim for the first time in federal court. *See id.* at 74-75. Accordingly, the IIED claim is dismissed for untimeliness, not for lack of jurisdiction.

To plead a *prima facie* claim of disability discrimination, a plaintiff must allege that: "(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered [an] adverse employment action because of [her] disability." *Dominelli v. N. Country Acad.*, No. 1:16-cv-00203, 2016 WL 6833992, *3 (N.D.N.Y. Nov. 18, 2016) (citing *Hammond v. Keyspan Energy*, 349 Fed. Appx. 629, 630 (2d Cir. 2009)). With regard to Plaintiff's disability discrimination claim under the HRL, "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004); *see also Brouillard v. Sunrun, Inc.*, 219 A.D.3d 560, 561-62 (2d Dep't 2023) (explaining the facts a plaintiff must allege in an HRL disability discrimination claim to survive a motion to dismiss).

### 1. Employer Subject to the ADA

On the first element, an employer is generally subject to the ADA if it has fifteen or more employees. *See* 42 U.S.C. §§ 12111(4)-(5). Plaintiff alleges in her second amended complaint that Defendant employs more than 15,000 people. *See* Dkt. No. 25 at 3. Defendant does not dispute that its workforce surpasses the ADA minimum. Thus, the first element is adequately pled at this stage.

### 2. Employee's Disability

On the second element, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff alleges that she suffers from multiple diagnosed conditions, including traumatic brain injury and post-traumatic stress disorder. *See* Dkt. No. 25 at 4. The second amended complaint states that Plaintiff

experiences cognitive delays; difficulty with concentration, adaptation, memory, and motor function; anxiety; vision impairment; lockjaw; and claustrophobia. *See id.* Construing Plaintiff's pleading liberally due to her *pro se* status, the Court reads the second amended complaint as alleging that Plaintiff's disabilities substantially limit at least one major life activity, and that she is disabled within the meaning of the ADA. *See Phelan v. Thomas*, 439 Fed. Appx. 48, 50 (2d Cir. 2011) (holding that a *pro se* plaintiff adequately pled his status as an ADA-qualified individual by alleging diagnoses of traumatic brain injury, neurological impairment, and attention deficit disorder). Accordingly, Plaintiff has adequately pled the second element.

### 3. *Employee's Qualifications*

On the third element, the Second Circuit has stated that "an individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without reasonable accommodation." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99-100 (2d Cir. 2003) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995)). Importantly, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Id.* at 100 (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)).

To this end, Plaintiff's second amended complaint does not address her job qualifications in much detail. The pleading states in conclusory fashion that Plaintiff was "highly qualified" and exhibited "poise[] and professional[ism] in all communication to support patients and providers," but does not elaborate any further. Dkt. No. 25 at 3. Construed liberally, the pleading seems to specify Plaintiff's job duties as assisting patients upon arrival, confirming their demographic information, and "coordinating complicated doctors' orders and prescribed testing . . . ." *Id.* at 9. Although Plaintiff's requested work-from-home accommodation would arguably complicate Plaintiff's ability to process patients and potentially eliminate an essential job

function, *see id.* at 10; Dkt. No. 26-1 at 17, a *very* generous reading of her second amended complaint could suggest she was qualified to perform her job functions without the accommodation.

### 4. *Adverse Employment Action Because of Employee's Disability*

On the fourth element, Plaintiff largely fails to satisfy the pleading standard. Although her second amended complaint recites Defendant's alleged adverse employment actions against her, most of those actions do not rise to the level of adverse employment actions within the meaning of the law, and she fails to sufficiently allege that discriminatory animus caused Defendant's actions.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (quoting *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The Second Circuit does not recognize a bright-line rule as to what conduct rises to the level of an adverse employment action, but as a general matter, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citing *Sanders*, 361 F.3d at 755).

In its motion to dismiss, Defendant argues that most of its actions do not rise to the level of adverse employment actions, including Plaintiff's lack of voicemail access, Warner's yelling at Plaintiff, and the official corrective action taken against Plaintiff. *See* Dkt. No. 26-1 at 13. However, as Defendant concedes, termination is regarded as an adverse employment action. *See Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 434 (E.D.N.Y. 2015) (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). The Second Circuit has also recognized certain demotions, loss of benefits, and decreased responsibilities as adverse

employment actions. *See Feingold*, 366 F.3d at 152. This Court agrees that Defendant's actions, other than the termination of Plaintiff, likely do not rise to the level of adverse employment actions because they did not alter the terms or conditions of her employment.

However, even if all of Defendant's alleged conduct constituted adverse employment actions, the ADA still requires Plaintiff to prove a causal link between the adverse employment actions and Defendant's alleged discriminatory animus. The Second Circuit has specified that for ADA claims, a plaintiff must prove but-for causation. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). In other words, the plaintiff must prove that absent the defendant's discriminatory animus, the adverse action would not have occurred. By extension, at the pleading stage, Plaintiff must allege sufficient facts to support a finding of but-for causation. *See Sharikov v. Philips Med. Sys. MR, Inc.*, 659 F. Supp. 3d 264, 277 (N.D.N.Y. 2023) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016)) (finding that the plaintiff did not state a viable claim of disability discrimination because the alleged facts "[could not] support a plausible inference that [the p]laintiff would not have been terminated or subjected to an adverse employment action but for a disability").

In her second amended complaint, Plaintiff details Defendant's alleged wrongdoings and states repeatedly that Defendant mistreated her because of her disability, but she does not plead other facts to support that causal connection. *See, e.g.*, Dkt. No. 25 at 4 ("Plaintiff suffered adverse employment actions . . . because of her disability"), 9 ("Plaintiff was threatened, bullied[,] and subjected to discrimination and harassment based on her race and disability"). Despite the Court's best efforts to construe the pleading liberally, there are simply not enough facts to construe. As such, Plaintiff's disability discrimination claim is dismissed.

**D.     Failure to Accommodate Plaintiff's Disability**

To plead a *prima facie* claim of failure to accommodate a disability under the ADA, a plaintiff must allege that: (1) she is disabled within the meaning of the statute; (2) the employer had notice of the disability; (3) the employee "could perform the essential functions of the job with reasonable accommodation"; and (4) the employer "refused to make such accommodations." *Medlin v. Rome Strip Steel Co.*, 294 F. Supp. 2d 279, 287 (N.D.N.Y. 2003). The same elements are required for a failure to accommodate claim under the HRL. *See Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368-69 (S.D.N.Y. 2018). As discussed previously, Plaintiff established that she is disabled within the meaning of the ADA. This portion of the Court's analysis discusses the remaining elements of a failure to accommodate claim.

### 1. Employer's Notice of Employee's Disability

The ADA's "notice requirement is rooted in common sense." *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001). An employee may not sue her employer for failing to accommodate a disability that was unknown to the employer. *See id.* "Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability." *Id.* Accordingly, Plaintiff's second amended complaint may survive a motion to dismiss if it alleges sufficient facts to support an inference that Defendant knew about her disability.

Here, Plaintiff's second amended complaint states that she "candidly discussed" her traumatic brain injury with Warner during an introductory meeting shortly after her transfer. Dkt. No. 25 at 6. The pleading also mentions that Plaintiff gave Defendant a doctor's note detailing her anxiety, traumatic brain injury, and post-traumatic stress disorder. *See id.* at 10. However, this doctor's note accompanied her accommodations request, and it is unclear whether she had ever provided documentation of her disabilities at an earlier time. *See id.*; Dkt. No. 25-1

14

at 50-53.  Notwithstanding, Defendant's motion does not dispute whether it knew about Plaintiff's disabilities.  Construed liberally, Plaintiff's second amended complaint sufficiently alleges that Defendant had knowledge of her disabilities.

### 2.  *Performance of Essential Job Functions with a Reasonable Accommodation*

Conversely, the second amended complaint does not sufficiently allege that Plaintiff could have performed her essential job functions with a reasonable accommodation.  The Second Circuit uses a multi-factor analysis to determine a job's essential functions, including "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions."  *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (citing *Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)).  Ultimately, an essential job function must be "fundamental" to the job, and not "merely 'marginal.'"  *Stone*, 118 F.3d at 97 (quoting 29 C.F.R. § 1630.2(n)(1)).

As discussed previously, Plaintiff does not describe her job functions in detail.  The second amended complaint suggests that her essential duties included greeting patients upon arrival to the clinic, confirming patients' demographic information, and coordinating physician orders and prescribed testing.  *See* Dkt. No. 25 at 9.  Without describing her essential tasks, Plaintiff cannot adequately plead that she could perform those tasks with a reasonable accommodation.  Beyond the facts alleged in the second amended complaint, the Court will not speculate about the essential functions of Plaintiff's position.

Because Plaintiff fails to sufficiently plead her ability to perform the essential functions of her job with a reasonable accommodation, her claim cannot survive a motion to dismiss.  In this

context, dismissal is required, whether or not the Defendant refused to provide Plaintiff's requested accommodations.  Accordingly, the failure to accommodate claim is dismissed.

**E.    Race Discrimination**

To state a *prima facie* claim of discrimination under Title VII, including on the basis of race, Plaintiff must allege that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination." *Garvey v. Wegmans*, No. 5:17-CV-01257, 2018 WL 5983374, *4 (N.D.N.Y. Nov. 14, 2018) (quoting *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012)).  The HRL has the same requirements at the pleading stage.  *See Castro v. City Univ. of N.Y.*, 238 A.D.3d 1106, 1107 (2d Dep't 2025) (articulating the same requirements for a claim of discrimination under the HRL).  Thus, for both her claims, Plaintiff must state sufficient facts to support an inference that Defendant discriminated against her because of her race.

**1.    *Protected Class Membership***

The text of Title VII explicitly identifies race as a protected class.  42 U.S.C. § 2000e-2(a)(1).  This means that, no matter an employee's race, an employer may not subject an employee to termination or other adverse employment actions because of that person's race.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79 (1976).  In her second amended complaint, Plaintiff asserts protected class membership by identifying herself as Filipina, which she alleges motivated Defendant's conduct.  *See* Dkt. No. 25 at 4.  Thus, the pleading standard is satisfied with respect to this element.

**2.    *Employee's Qualifications for the Position***

To prove that she was qualified for her position within the meaning of Title VII, Plaintiff must allege facts that show she "possesse[d] the basic skills . . . necessary for the position . . . ." *Wooten v. Reconstruction Home, Inc.*, No. 5:02-CV-01278, 2005 WL 1502149, *6 (N.D.N.Y. June 24, 2005). As previously discussed in the disability context, Plaintiff's second amended complaint does not provide much information on her job duties or qualifications. The pleading makes conclusory statements that Plaintiff was "highly qualified" and exhibited "poise[] and professional[ism] in all communication to support patients and providers," but does not allege facts exemplifying her qualifications. Dkt. No. 25 at 3. However, in its motion to dismiss, Defendant does not dispute Plaintiff's qualifications. Accordingly, the Court assumes *arguendo* that Plaintiff was qualified for the position and analyzes the two remaining elements: adverse employment action and inference of unlawful discrimination.

### 3.    *Adverse Employment Action*

As discussed previously, Plaintiff's termination constituted an adverse employment action within the meaning of the applicable law. The rest of Defendant's alleged misconduct does not rise to this level, although it may be construed as evidence possibly supporting discriminatory animus behind Plaintiff's termination.

### 4.    *Inference of Unlawful Discrimination*

Unlike claims arising under the ADA, Title VII discrimination claims do not require a showing of but-for causation. Rather, a plaintiff's claim can survive if she pleads facts suggesting that her membership in a protected class was simply a *motivating factor* behind the alleged discriminatory conduct. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85-86 (2d Cir. 2015); 42 U.S.C. § 2000e-2(m) (clarifying that the alleged motivating factor need not be the only motivating factor). A plaintiff may prove discrimination through direct evidence of the

17

employer's intent to discriminate, or indirectly "by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (citations omitted). Accordingly, the Second Circuit recognizes that "[a]t the pleadings stage, . . . a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that . . . giv[e] rise to a plausible inference of discrimination." *Id.*

Importantly, however, "hostility alone is not actionable." *Lugo v. Le Pain Quotidien*, No. 13-CV-6450, 2015 WL 1808558, *4 (S.D.N.Y. Apr. 13, 2015). When determining whether an individual's remarks give rise to an inference of discrimination, courts examine several factors. These factors include who made the remark, whether that person had decision-making power, the remark's temporal proximity to the adverse employment decision, whether a reasonable person would interpret the remark as discriminatory, and whether the remark was related to the process of making the employment decision. *See Wooten*, 2005 WL 1502149, at *11; *see also Abboud v. Cnty. of Onondaga*, 341 F. Supp. 3d 164, 180-81 (N.D.N.Y. 2018) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)) (explaining that temporal proximity must be "very close," and the Supreme Court has recognized a period of four months as too long to support an inference of discrimination). Furthermore, the Second Circuit has recognized that an "employer's criticism of the plaintiff's performance in ethnically degrading terms," "invidious comments about others in the employee's protected group," and "more favorable treatment of employees not in the protected group" can contribute to an inference of discriminatory intent. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

Construing Plaintiff's second amended complaint liberally, the Court identifies the following as Plaintiff's proffered indirect evidence of Defendant's discriminatory intent: (1)

18

Warner's "yell[ing] with hatred" at Plaintiff that a clinic doctor, who "has the same coloring as Plaintiff," could "room her own patients"; (2) Warner's throwing a paper in Plaintiff's face and yelling at her to stop printing documents to a physician's printer; (3) Warner's pronunciation of Plaintiff's last name in a manner that Plaintiff found degrading and racially offensive; (4) Warner's Facebook post appearing to reference an altercation with Plaintiff, which garnered comments in support of Warner and made Plaintiff feel threatened; (5) removal of Plaintiff's voicemail box while Caucasian ASAs retained their voicemail boxes; (6) Defendant's formal corrective action against Plaintiff for alleged misconduct; (7) Defendant's singling out Plaintiff and blaming her for technical issues with a printer, while white employees were not blamed; (8) Defendant's failure to interview Plaintiff about her own misconduct accusation, while white employees were interviewed; and (9) Defendant's allowing white employees to attend in-house doctor's appointments and visit human resources while on the clock, but punishing Plaintiff for doing so. *See* Dkt. No. 25 at 7-13.

For many of these actions, Plaintiff does not allege facts supporting a nexus between the conduct and discriminatory animus on Defendant's part. For example, although Warner's yelling at Plaintiff and throwing a paper in her face may have been intimidating, rude, or otherwise inappropriate, Plaintiff does not set forth any facts connecting this treatment to her race or her ultimate discharge. The Court reaches a similar conclusion for the Facebook post. Although it does appear to reference the tense exchange between Plaintiff and Warner, the post does not refer to Plaintiff's race or have any other apparent connection to her termination. Furthermore, although Warner allegedly yelled at Plaintiff about a physician with "the same coloring" as Plaintiff, the second amended complaint does not contain factual allegations linking that instance to racial animus or Plaintiff's discharge. Similarly, Plaintiff has not alleged any facts suggesting

19

that the official corrective action—which Defendant contends was in response to an incident where Plaintiff yelled across the office and contains no mention of her race—can serve as evidence of discriminatory animus that motivated her discharge.

Warner's offensive pronunciation of Plaintiff's name is slightly less clear. This Court has recognized that even blatantly racist comments must still share a nexus with the adverse employment action giving rise to the complaint. *See Abboud*, 341 F. Supp. 3d at 180-81 (finding no inference of discriminatory intent when an employee's superior, who was not the ultimate decision-maker behind a written reprimand of the employee, reportedly made a remark about "you fucking Arabs blowing up shit" more than four months before the reprimand). Warner's offensive pronunciation of Plaintiff's name occurred on January 31, 2023, less than two months before her discharge. Dkt. No. 25 at 8. Thus, its temporal proximity weighs in favor of an inference of discrimination. However, while Plaintiff alleges that Warner addressed her in a racially discriminatory manner, *see id.*, other courts in this circuit have stated that simply making stray remarks in a certain accent is not tantamount to racial discrimination, *see Bellom v. Neiman Marcus Grp., Inc.*, 975 F. Supp. 527, 532 (S.D.N.Y. 1997) (holding that mocking a person's accent "on one or two occasions" did not support a discrimination claim); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 547 (W.D.N.Y. 2016) ("Vague allegations that co-workers made fun of [the plaintiff's] accent . . . , with no additional supporting factual information as to the context and frequency of this conduct, . . . do not plausibly allege conduct that is sufficiently severe so as to alter the terms and conditions of [the p]laintiff's employment"). While this Court acknowledges that Warner's pronunciation of Plaintiff's name was offensive to Plaintiff, this conduct, as pled, does not support an inference of discriminatory termination based on race.

The rest of Defendant's alleged misconduct involves disparate treatment of Plaintiff relative to her white colleagues. When drawing comparisons to show disparate treatment, a plaintiff "must show that she was treated differently from [her] 'similarly situated' [colleagues]." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). "To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects." *Id.* For example, in *Shumway v. United Parcel Service*, the Second Circuit held that a female employee accused of violating a no-fraternization policy did not meet this standard because she did not allege any facts showing that male employees were treated differently under the policy. *See id.* Importantly, the Second Circuit emphasized that the plaintiff alleged no facts to show that the male comparators engaged in the same misconduct of which she was accused. *Id.* Under the *Shumway* standard, "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards[,]" and that the comparator employees "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *see also Castro*, 238 A.D.3d at 1107-08 ("When plaintiffs seek to draw inferences of discrimination by showing that they were similarly situated in all material respects to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.") (quoting *Diaz v. Minhas Constr. Corp.*, 188 A.D.3d 812, 814 (2d Dep't 2020)).

Plaintiff's second amended complaint describes several instances where Defendant allegedly treated her differently from her white colleagues. For example, Plaintiff contends that the Caucasian ASAs retained voicemail access while Plaintiff did not; Plaintiff was blamed for issues with her printer, but her white colleagues did not receive blame for problems with their printers; Defendant did not interview Plaintiff about her misconduct accusation, but did interview

some of her Caucasian colleagues; and Plaintiff was penalized for attending in-house doctor's appointments and human resources visits while on the clock, which white colleagues have been allowed to do without penalty. *See* Dkt. No. 25 at 9-13. Although Plaintiff alleges numerous instances of disparate treatment, her second amended complaint does not contain facts that satisfy *Shumway*. For instance, rather than pointing to specific examples of white employees attending medical appointments while on the clock, Plaintiff broadly alleges that it has occurred and that no punishment followed. *See id.* at 11-13. With the stated facts, it is impossible for the Court to infer whether those employees were situated similarly to Plaintiff. Likewise, for the other allegations, Plaintiff does not plead any facts supporting an inference that the referenced Caucasian colleagues were situated similarly to her (such as, per *Shumway*, by engaging in the same conduct or being subject to the same discipline standards). Although the second amended complaint alludes to these similarities, they are simply stated in conclusory fashion, which does not satisfy the pleading standard.

The only potential exception is the revocation of Plaintiff's voicemail access, which the other two ASAs retained. However, Plaintiff's second amended complaint incorporates by reference an email from Warner that discusses numerous patient complaints of unreturned phone calls. *See* Dkt. No. 25-1 at 44. Thus, to allege disparate treatment and show that her colleagues are similarly situated, Plaintiff must plead facts showing that the other two ASAs retained phone access after failing to return phone calls from patients. The complaint does not offer any such facts. Accordingly, Plaintiff's race discrimination claim is dismissed.

**F.    Retaliation**

The standards for retaliation claims are "substantially similar" under Title VII and the ADA. *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 96 (S.D.N.Y.

2024) (quoting *Sharikov*, 103 F.4th at 170).  Both laws require Plaintiff to allege the following:
(1) "she participated in an activity protected by Title VII" or the ADA; (2) the employer knew
about Plaintiff's participation; (3) "the employer 'subjected her to a materially adverse' action
thereafter"; and (4) "a 'causal connection' existed between the 'protected activity' and the adverse
action."  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024); *Tafolla v. Heilig*, 80
F.4th 111, 125 (2d Cir. 2023).  The same standard applies under the HRL.  *See Tafolla*, 80 F.4th
at 125.

### 1.  *Participation in Protected Activity*

In the retaliation context, "[p]rotected activity includes opposing an unlawful employment
practice or otherwise making a charge, testifying, assisting, or participating 'in any manner in an
investigation, proceeding, or hearing.'"  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir.
2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).  Importantly,
a retaliation plaintiff does not need to show that the employer's behavior actually violated the law.
*See Cooper v. N.Y. State Dep't of Lab.*, 819 F.3d 678, 680-81 (2d Cir. 2016).  Rather, Plaintiff
must show a "good faith, reasonable belief" that her employer's conduct was an unlawful
employment practice.  *Id.* (citations omitted).

To that end, although "[c]omplaints about conduct clearly prohibited by the statute need
not mention discrimination or use particular language," a plaintiff must allege more than just
"ambiguous complaints that do not make the employer aware of alleged discriminatory
misconduct . . . ."  *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 318 (N.D.N.Y. 2013).  In
*Bader v. Special Metals Corp.*, this Court held that the plaintiff engaged in protected activity by
complaining "that four male supervisors had 'intentionally been making her work environment
unbearable' and that [she] had been 'threatened various times' with suspension and termination[,]"

even though she did not "explicitly invoke 'discrimination' . . . ." *Id.* at 321-22.  The Court also found that complaints of repeated screaming and yelling were protected activity for purposes of a retaliation claim, partly because the circumstances gave the defendant employer adequate notice that the plaintiff was premising her retaliation claim on the complained-of conduct.  *Id.* at 319-20. As summed up by another court in this circuit, "a [p]laintiff's complaint constitutes a protected activity so long as she articulated the substance of her complaint in such a way that her employer would 'reasonably underst[and]' that it was about unlawful discrimination against her." *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 255 (S.D.N.Y. 2024) (citation omitted).

In its motion to dismiss, Defendant argues that Plaintiff did not engage in a protected activity by way of her February 3, 2023 human resources complaint, because that complaint does not mention harassment or discrimination.  Dkt. No. 26-1 at 20.  The human resources complaint does mention that Warner yelled at Plaintiff and behaved aggressively on multiple occasions, including in front of patients.  *See* Dkt. No. 25-1 at 46-47.  However, as Defendant points out, nothing in the human resources complaint appears to put Defendant on notice of allegations of unlawful discrimination.  While the Court does not question Plaintiff's good-faith belief that Defendant discriminated against her, and although the human resources complaint describes Warner's allegedly inappropriate and unprofessional behavior toward Plaintiff, that complaint does not provide sufficient detail to show Defendant that the complaint concerned unlawful discrimination.  Had the human resources complaint discussed Plaintiff's race or disability in any capacity, Defendant might have been on adequate notice.  Thus, the Court holds that Plaintiff did not engage in a protected activity by filing a complaint with human resources.

However, the Court reaches a different conclusion on Plaintiff's request for accommodations, which Defendant challenges as "not a protected activity as a matter of law." Dkt. No. 26-1 at 21. Defendant cites multiple New York state cases for the proposition that the HRL does not recognize accommodation requests as a protected activity in retaliation contexts. This is a correct statement of New York law, and by extension, Plaintiff's accommodation request cannot support her retaliation claim under the HRL. *See Witchard v. Montefiore Med. Ctr.*, 103 A.D.3d 596, 596 (1st Dep't 2013); *see also Graham v. N.Y. State Off. of Mental Health*, 154 A.D.3d 1214, 1221 (3d Dep't 2017) (citing *Witchard*, 103 A.D.3d at 596) (declining to decide whether the plaintiff's request for reasonable accommodations constituted a protected activity, but assuming based on existing New York judicial precedent that it would not). Plaintiff's retaliation claim under the HRL is therefore dismissed.

In a critical distinction not mentioned in Defendant's motion, federal law differs and produces a different outcome for Plaintiff's retaliation claims under the ADA, at least with regard to this element. This Court has previously recognized that a request for disability accommodations is a protected activity for purposes of a retaliation claim under the ADA. *See Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 544 (N.D.N.Y. 2021); *Muller v. Costello*, No. 94-CV-842, 1996 WL 191977, *6 (N.D.N.Y. Apr. 16, 1996); *see also Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000). Thus, by alleging that she sought reasonable accommodations, Plaintiff has met the pleading standard for the first prong of her ADA retaliation claim. Dkt. No. 25 at 10; Dkt. No. 25-1 at 49-53. However, Plaintiff's Title VII claim is subject to dismissal because the requested accommodation was not protected by Title VII (unlike, for example, an accommodation for a religious practice or belief).

### 2. *Employer's Knowledge of Employee's Participation*

To satisfy the pleading standard with respect to the second element of her surviving retaliation claim, Plaintiff must allege that her employer knew about her request for reasonable accommodations. Her second amended complaint states that she filed the request personally at Defendant's human resources office in Albany, in compliance with Defendant's policy. *See* Dkt. No. 25 at 10. Defendant does not contest whether it knew of Plaintiff's accommodations request. Thus, the Court considers this element sufficiently pled.

### 3. *Materially Adverse Action*

An action is considered "materially adverse" if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Moll*, 94 F.4th at 239 (quoting *Burlington*, 548 U.S. at 57). An objective standard, based on the perceptions of a reasonable employee, governs whether an employer's action is materially adverse. *See id.* (quoting *Burlington*, 548 U.S. at 69); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011). Additionally, courts must evaluate alleged retaliatory acts "both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien*, 663 F.3d at 568.

Plaintiff filed her disability accommodations request on March 20, 2023. Dkt. No. 25 at 10. Thus, any materially adverse action in retaliation for that request must have happened after that date. Of the alleged unlawful actions previously discussed, only Plaintiff's termination, which occurred on March 27, 2023, came after the accommodations request. *See* Dkt. No. 25-1 at 55. Also, as previously mentioned, terminations are regarded as materially adverse employment actions. *See Vale*, 80 F. Supp. 3d at 434 (citing *Feingold*, 366 F.3d at 152). This conclusion makes sense, as a sudden job loss could be expected to dissuade a reasonable employee from

engaging in certain protected activities.  Accordingly, the Court finds that Plaintiff has sufficiently pled this element of her ADA retaliation claim.

### 4. *Causal Connection*

To fully satisfy the pleading standard on her surviving retaliation claim, Plaintiff must allege sufficient facts showing that Defendant's materially adverse employment action occurred *because of* her participation in a protected activity.  Importantly, a retaliation plaintiff must show but-for causation.  *Banks*, 81 F.4th at 275.  In other words, Plaintiff's pleading must be sufficiently descriptive to support an inference that Defendant fired her because she requested a disability accommodation, and that her discharge would not have happened absent the accommodations request.  A plaintiff can meet this burden by "showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence."  *Bader*, 985 F. Supp. 2d at 324 (quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)).  "In general, a temporal gap of less than two months is sufficient to give rise to an inference of causation."  *Id.* at 324-25 (finding a five-day gap to be "strong evidence of causation"); *see also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding that a twelve-day gap supports an inference of causation).

The temporal closeness between Plaintiff's accommodations request and her termination weighs in her favor.  Plaintiff's second amended complaint alleges that her discharge occurred within a week after she submitted her request—which is far less than two months.  *See* Dkt. No. 25 at 10-13.  However, as Defendant points out in its motion to dismiss, the employer's proffered reasons for terminating Plaintiff are misconduct and time theft.  Dkt. No. 26-1 at 22.  Plaintiff also acknowledges these purported motives in her second amended complaint.  Dkt. No. 25 at 11-13.  Defendant could well have based Plaintiff's discharge solely on that alleged misconduct and time

theft, but the temporal closeness between her accommodations request and her discharge falls

squarely within the range that this Court has recognized as heavily indicative of retaliatory intent.

At this juncture, the Court finds that Plaintiff has satisfied the pleading standard with

respect to her ADA retaliation claim.

**G.    Hostile Work Environment**

To allege a hostile work environment under Title VII, Plaintiff must show that: (1) the

hostility was objectively severe or pervasive; (2) Defendant's conduct created an environment that

Plaintiff subjectively perceived as hostile or abusive; and (3) Defendant's conduct created a

hostile environment because of Plaintiff's race or disability. *See Patane*, 508 F.3d at 113.  Hostile

work environment claims under the ADA are subject to the same framework. *See Sharikov*, 659

F. Supp. 3d at 287.  "This test has objective and subjective elements: the misconduct shown must

be 'severe or pervasive enough to create an objectively hostile or abusive working environment,'

and the victim must also subjectively perceive that environment to be abusive." *Alfano v.

Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993)).  Importantly, Plaintiff need only show that the hostility was severe *or* pervasive, not

both. *See id.*  The HRL's standard for a hostile work environment claim is similar, requiring a

plaintiff to show that her workplace is "permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment

and create an abusive working environment." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 194

A.D.3d 999, 1003 (2d Dep't 2021) (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295,

310 (2004)).

Under both federal and state law, repeated incidents are usually required for harassment to

be pervasive, but a single incident can suffice if "it can and does work a transformation of the

28

plaintiff's workplace." *Alfano*, 294 F.3d at 374; *see Bilitch*, 194 A.D.3d at 1003.  Also, Title VII, the ADA, and the HRL all require courts to examine the totality of the circumstances when evaluating a hostile work environment claim, including frequency of the conduct and whether it was physically intimidating.  *See Bilitch*, 194 A.D.3d at 1003; *Alfano*, 294 F.3d at 379.

Here, Plaintiff bases her hostile work environment claims on alleged harassment, denial of accommodations, and wrongful termination.  Dkt. No. 25 at 6.  Plaintiff reiterates throughout her pleading that she found Defendant's conduct subjectively abusive.  While a reasonable employee would likely find the conduct that Plaintiff describes unpleasant, "abusive" is a much higher bar.  However, as with most of her other causes of action, her pleading falls short on the causation prong.

As discussed already, Plaintiff's second amended complaint alleges that her supervisor yelled at her, threw a paper in her face, and pronounced Plaintiff's name in a way that made her feel degraded.  *See id.* at 8.  Plaintiff also alleges that her supervisor posted about her on Facebook, and that the post and its comments made her feel threatened and bullied.  *See id.* at 9.  The second amended complaint claims that Plaintiff's supervisor made the post with discriminatory animus because of Plaintiff's race and disability, but does not allege further facts to support that alleged causal connection.  *See id.*

Relatedly, although the second amended complaint alleges that Defendant denied Plaintiff's request for accommodations, Plaintiff does not plead any facts tending to show that the denial itself was discriminatory based on her race or disability.  Likewise, Plaintiff alleges a hostile work environment by way of discriminatory termination, but does not allege any facts supporting an inference that race or disability discrimination motivated her discharge (although, as discussed prior, she has sufficiently pled a claim of retaliation under the ADA).  Rather,

Plaintiff makes conclusory statements about Defendant discriminating against her on the basis of disability and race, but she does not introduce factual assertions to demonstrate that causal link.

Plaintiff's second amended complaint makes clear that she found many aspects of her employment unpleasant. However, nearly all of the unpleasant interactions and incidents are devoid of any facts suggesting that Plaintiff's race or protected activity was a factor. As the Supreme Court has noted, Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68 (quotation omitted). Given the absence of non-conclusory allegations suggesting unlawful animus, Plaintiff's hostile work environment claims must be dismissed.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 26) is **GRANTED in part and DENIED in part**;[6] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 15, 2025
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[6] As a result of this Memorandum-Decision and Order, Plaintiff's only remaining claim is retaliation under the ADA.